**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUPE E. MARTINEZ, on behalf of herself and all similarly situated, RALPH C. RENDON, on behalf of himself and all similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>CITY OF FRESNO; JERRY DYER, Chief of the Fresno Police Department, SGT. MICHAEL MANFREDI, OFFICER MARCUS K. TAFOYA, OFFICER BELINDA ANAYA, and DOES 1-20, in their individual and official capacities, inclusive,<br><br>　　　　　　　Defendants. | 1:06-CV-00233 OWW GSA<br><br>[Consolidated with 1:06-cv-01851]<br><br>MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MANFREDI AND TAFOYA'S MOTION FOR TRANSFER OF VENUE (DOC. 217) |
| CALUDIA RENDON, GEORGE RENDON, PRISCILLA RENDON, LAWRENCE RENDON, RICARDO RENDON, JOHN NUNEZ, JR., ALFRED HERNANDEZ, AND VIVIAN CENTENO,<br><br>　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>CITY OF FRESNO, JERRY DYER, individually and in his official capacity as the Chief of Police for the Fresno Police Department; MICHAEL MANFREDI, individually and in his official capacity as Police Officer of the Fresno Police Department, BELINDA ANAYA, individually and in her official capacity as a Police Officer for the Fresno Police Department, and DOES 1 through 50, inclusive,<br><br>　　　　　　　Defendants. | |

1

Before the court for decision is Defendants' Michael Manfredi and Marcus K. Tafoya's motion for transfer of venue to the Sacramento Division pursuant to Title 28, United States Code, section 1404(A). Manfredi and Tafoya maintain that "substantial, inflammatory, and prejudicial pretrial publicity" in this case "has rendered the Fresno community incapable of offering the moving parties a fair and impartial jury." Doc. 217. Defendants, the City of Fresno, Chief Jerry Dyer, and Belinda Anaya, oppose the motion to transfer on convenience grounds, taking no position on the impact of the publicity. Doc. 289. Plaintiffs Lupe Martinez, George Rendon, and Priscilla Rendon join the City, Dyer, and Anaya's opposition. Doc. 290.

A district court has authority to transfer an action "[f]or the convenience of the parties and witnesses, in the interest of justice, ... to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The moving party bears the burden to show that transfer is appropriate. *Los Angeles Mem'l Coliseum Comm'n. v. Nat'l Football League*, 89 F.R.D. 497, 499 (C.D. Cal. 1981), aff'd, 726 F.2d 1381, 1399 (9th Cir. 1984). In deciding on the transfer motion, the district court must consider (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of the witnesses; and, (4) the interests of justice. *Id*. at 499.

Here, the first three factors favor maintaining venue in

Fresno. The Plaintiffs chose to bring their cases here, and all of the parties and witnesses reside in the area. Defendants' motion implicates the fourth factor -- the interests of justice -- by suggesting that it would be impossible for Defendants Manfredi and Tafoya to obtain a fair trial in the Fresno area.

"[A] judge has a duty to protect the defendant's rights to a fair trial." *Washington Pub. Utilities Group. v. U.S. Dist. Court for W. Dist. of Wash*, 843 F.2d 319, 326 (9th Cir. 1987). "Where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). "A decision whether a change of venue is compelled by pervasive prejudicial publicity concerns an exercise of discretion." *Washington Pub. Utilities Group,* 843 F.2d at 324.

"The standards governing a change of venue ultimately derive from the due process clause of the fourteenth amendment which safeguards a defendant's sixth amendment right to be tried by "a panel of impartial, 'indifferent' jurors." *Harris v. Pulley*, 885 F.2d 1354, 1363 (9th Cir. 1988) (quoting *Irvin v. Dowd*, 366 U.S 717, 722 (1961); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976)). The trial court may be unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed

3

community atmosphere. In such a case, due process requires that the trial court grant defendant's motion for a change of venue. *Id*. (internal citations omitted). "The prejudicial effect of pervasive publicity is tested under the presumed prejudice or the actual prejudice standards." *Id*.

> Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudical and inflammatory media publicity about the crime. Under such circumstances, it is not necessary to demonstrate actual bias. The presumed prejudice principle is rarely applicable, and is reserved for an extreme situation.

*Id*. (internal citations and quotations omitted).

Prejudice sufficient to trigger the presumption was present in *Rideau v. Louisiana*, 373 U.S. 723, 723-24 (1963), in which defendant confessed to robbing a bank, kidnapping three of the bank's employees, and killing one of them. His confession was videotaped and subsequently broadcast on multiple occasions by a local television station serving the community of 150,000. *Id*. at 724. The Supreme Court reversed the denial of the motion to change venue, concluding "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury," due process required a trial before a community of persons who had not seen the televised confession. *Id*. at 727. The televised confession "was Rideau's trial," and "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id*. at 726.

4

In *Harris,* 885 F.2d at 1359, defendant was tried for bank robbery, kidnapping, and murder. *See People v. Harris*, 28 Cal. 3d 935, 946 (1981). He later claimed that his right to trial by an impartial jury was impaired "because of pervasive media coverage resulting from [a] public dispute between federal and state prosecutors over which office would be first to prosecute [him]." *Harris v. Pulley*, 885 F.2d at 1359. The Ninth Circuit described the media coverage as follows:

> The vast majority of the media accounts are largely factual in nature. [Citations] It is quite true that some of the media reports refer to Harris' prior criminal record, and the alleged confession of each brother. These accounts, however, were published within the two weeks immediately following the homicides. The number of news reports regarding the Harris case had dissipated considerably by the time of jury selection four months later.
>
> Harris also claims "the record of publicity in this case demonstrates repeated acts by state and federal prosecutors releasing inflammatory statements, each publicly vying to outinsure [sic] the other that their jurisdiction would best guarantee appellant's permanent isolation from society." Harris argues that the release of publicity by law enforcement demonstrates the atmosphere surrounding the trial was so inflammatory as to undermine his right to a fair trial. The record does not support this contention.
>
> Former California Supreme Court Chief Justice Rose Elizabeth Bird, in her dissent in *People v. Harris*, described the public disagreement that occurred between the offices of the United States Attorney and the county district attorney as follows:
>
>> About this time, the publicity surrounding this case in San Diego County developed a new aspect, as the two major prosecutorial officers in the county became engaged in a sharp public dispute over which office would "get first crack" at prosecuting appellant. The local United States Attorney's office was responsible for the

5

prosecution of the bank robbery offense, and the county district attorney for the homicides. Each office issued statements indicating what sentence appellant would likely obtain if convicted in its respective court. The United States Attorney claimed that the federal charges were an "insurance policy" against appellant's early release by the parole board. After the district attorney's office responded that it was seeking the death penalty-a punishment not available in the federal courts for bank robbery-the United States Attorney held a televised news conference at which he expressed the opinion that the California death penalty law was unconstitutional.

The district attorney's office took the public position that if the federal charges were tried first, the state might lose the opportunity to try appellant and obtain a death sentence. The district attorney attempted to delay appellant's arraignment in federal court, and members of the office accused the United States Attorney of "political grandstanding."

The United States Attorney responded that it was the county prosecutors who were "grandstanding."

When the federal authorities obtained a trial date of October 3, the Tribune noted this "tightens the race between the two jurisdictions as to which will be the first to try the case." An assistant district attorney described the "competition" between his office and the federal prosecutors as an "awkward situation." On August 7, the district attorney was able to have the state trial set on a date earlier than October 3, and the press reported that the district attorney had "moved ahead" in his efforts to "beat federal authorities to the punch in prosecuting the Harris brothers."

Attorneys in the district attorney's office privately told the press that the motivation of the United States Attorney was "politics." They claimed "he is politically ambitious and ... he knows the case will receive a lot of publicity...." The United States Attorney responded that he was merely seeking "maximum protection of the community." Members of the

6

> district attorney's office were said to "scoff" at this justification.
>
> On August 10, the Union published a lengthy article on the jurisdictional dispute, reporting that a senior federal parole officer "disputed" the United States Attorney's computation of appellant's federal sentence. This official, who calculated a prison term "far under" the term mentioned by the United States Attorney, "cannot understand why [the United States Attorney] is insisting on prosecuting the two brothers from Visalia." County prosecutors were again said to claim that federal involvement was "for the sake of publicity." An assistant legal counsel for the C.R.B. computed for the Union that "the least" appellant would serve in state prison would be a term of years well beyond the term calculated by the federal parole officer.
>
> These events were duly reported by the Union, the Times, the Evening Tribune, and by the local television stations over a two and one-half week period from July 20th through August 10th, and beyond.

28 Cal.3d at 969-71.

These facts do not reveal a "general atmosphere in the community or courtroom [which] is sufficiently inflammatory" to deny Harris a fair trial by impartial jurors. *Murphy [v. Florida]*, 421 U.S. [794,] 802 [1975]. The dispute between the two prosecutorial branches focused on the merits of each criminal system in the context of this particular case; the publicized dispute did not involve a prejudgment by either office as to the guilt of Harris which existed in *Silverthorne v. United States*, 400 F.2d 627 (9th Cir.1968), relied upon by Harris. Similarly, the disagreement was relatively short-lived, only spanning a brief two and one-half week period in the early part of the four-month period between the homicides and the voir dire of the jury. Under the "totality of circumstances," *Murphy*, 421 U.S. at 799, *Patton*, 467 U.S. at 1031, , the public dispute between the federal and local prosecution does not warrant a finding of community prejudice sufficiently inflammatory to deny Harris a fair trial.

7

885 F.2d at 1362-63.  The Ninth Circuit concluded that "the record of publicity in the months preceding, and at the time of, the ... trial does not reveal [a] 'barrage of inflammatory publicity immediately prior to trial' amounting to a 'huge ... wave of public passion' to warrant a presumption that the jurors selected for the trial of this matter were prejudiced."  *Id*. at at 1362 (citing *Patton v. Yount*, 467 U.S. 1025, 1032-33 (9th Cir. 1988)).

   Here, Plaintiffs present copies of the following newspaper articles published from October 21, 2005 through March 31, 2009.

- Fresno Bee, October 21, 2005, "On Leave in Excessive-Force Investigation Man Says that Officers Hit, Kicked Him."
- Fresno Bee, November 5, 2005, "Lawsuits Accuse Fresno Police of Excessive Force."
- Fresno Bee, February 24, 2006, "Lawyer Defends Accused Officers; Attorney Critical of the Fresno Police Chief's Actions."
- Fresno Bee, March 11, 2006, "Six to Face Trial in Party Fracas; Homecoming Event for Iraq War Vet Turned Rowdy."
- Fresno Bee, October 6, 2006, "Fresno Will Pay $1.6m to Settle Lawsuit; Clovis Couple Alleged That a Police Officer Used Excessive Force on Them."
- Fresno Bee, December 31, 2006, "Fired Fresno Officers Sue Chief; Two Accused of Excessive Force Want Their Jobs Back."

- **Fresno Bee, October 11, 2007, "Judge Orders Fired Fresno Officer Reinstated."**
- **Fresno Bee, November 6, 2007, "Arbitrator Recommends Reinstating Fresno Cop; 20-year Veteran was One of Four Officers Fired in Excessive-Force Case."**
- **Fresno Bee, December 1, 2007, "Fired Cop Says Fresno Fights Reinstatement."**
- **Fresno Bee, March 1, 2008, "Transcript Details Attach by Ex-Officer; Grand Jury Witnesses Say Marcus Tafoya Beat People at Fresno Party."**
- **Fresno Bee, March 8, 2008, "Reinstated Officer Still Not Back on Job, Lawyer Says."**
- **Fresno Bee, September 10, 2008, "Fresno Officer Files Suit Against City, Dyer."**
- **Fresno Bee, March 31, 2009, "Judge Orders Fresno Cop to Give Names."**

*See* Fox. Decl., Doc. 210, Exs. 6-18.

Many of the more recent newspaper articles, particularly those concerning Officer Manfredi's reinstatement to the Police Force, are, at worst, neutral in character and content. Some of these arguably portray Officer Manfredi in a favorable light. Some older articles, mostly dating to 2006, factually describe the allegations in this and related lawsuits stemming from

Officer Manfredi and Tafoya's conduct.

In addition, the district court has reviewed a DVD containing a reproduction of a news report aired on KSEE, a local television station serving the Fresno area, featuring an interview with Plaintiffs' attorney, Peter Kapetan, in which Mr. Kapetan stated, "We had officers testify that Internal Affairs Investigations were being manipulated by the Department," and showing footage of deposition transcripts featuring Jerry Dyer admitting to violating police procedure in an unrelated case. *Id*. at Exs. 1-2.  A related article was posted on KSEE's website. *Id*. at Ex. 3.  The video and a related story on KSEE's website indicates that accusations had been made against Chief Dyer regarding his own misconduct and that a "civil rights lawsuit" claims Dyer's misconduct "opened the door for other officers to behave outside of policy."  The lawsuit stemmed "from a March 2005 incident involving current Fresno Police Sergeant Michael Manfredi and former officer Marcus Tafoya," who allegedly assaulted ten individuals at a welcome home party for Ralph Rendon, "a Marine who had served in Iraq."  The article explained that an officer had alleged in a deposition taken in connection with the lawsuit that he had been called a "rat" by Sergeant Manfredi, who was his superior at the time, for reporting apparent violations of police procedure.  The article alleged that Manfredi admitted in his deposition that he had knowledge

10

that police personnel improperly influenced the outcome of internal affairs investigations to exonerate guilty officers, but refused to give specific details during his deposition.

One of the more recent Fresno Bee articles, "Judge Orders Fresno Cop to Give Names" dated March 31, 2009, relates to the accusations in the KSEE report, describing how the assigned district judge in this case ordered Manfredi to comply with discovery requests to provide Plaintiffs' counsel with the names of officers allegedly involved in any manipulation of Fresno Police internal affairs investigation.

The KSEE report and the March 31, 2009 Fresno Bee article addressing a discovery dispute repeat Plaintiffs' allegations that Sergeant Manfredi used excessive force and did not cooperate in investigations of police wrongdoing, but do not constitute the kind of pervasive media coverage that requires a change in venue. A substantial portion of the KSEE report focuses on the past unrelated conduct of Chief Dyer, who opposes this motion to transfer venue. Even if the entire report focused on officers Manfredi and Tafoya, the coverage does not amount to a "barrage of inflammatory publicity immediately prior to trial" nor demonstrate a "huge ... wave of public passion" that would warrant a finding of likely prejudice. 855 F.2d at 1362. The trial is not set until February 2010. Two to four newspaper articles a year in one county of an eleven county district is not

1  saturation coverage.

2      Even if a few members of the Fresno community may have
3  been exposed to this coverage, whether any opinions about the
4  case have been easily formed, can be examined through voir dire.
5  It does not require a change of venue.

> It is not required ... that [] jurors be totally
> ignorant of the facts and issues involved. In these
> days of swift, widespread and diverse methods of
> communication ... scarcely any of those best qualified
> to serve as jurors will not have formed some impression
> or opinion as to the merits of the case. This is
> particularly true in criminal cases. To hold that the
> mere existence of any preconceived notion as to the
> guilt or innocence of an accused, without more, is
> sufficient to rebut the presumption of a prospective
> juror's impartiality would be to establish an
> impossible standard.

See *Crater v. Galaza*, 491 F.3d 1119, 1133 (9th Cir. 2007)
(quoting *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961)).  Moving
defendants have provided no evidence to demonstrate prejudice.

    Specifically, no public opinion surveys or other sampling of
public perceptions related to the case have been submitted.  The
geographic area of the Eastern District of California is huge,
the population over 3 million persons, twenty-seven percent of
whom reside outside of Fresno County.  In over eighteen years,
Fresno jurors comprise less than one-fourth of any jury and other
jurors from outside Fresno County are not informed or
knowledgeable about Fresno news and events.  The McClatchy
Publishing Company, which owns the Fresno Bee, also operates the
Modesto and Sacramento Bee newspapers, which rarely report local

news about Fresno.  There is a failure of proof of prejudicial pretrial publicity that exists to support a finding of prejudice among prospective jurors in the Eastern District of California or prejudicial pretrial publicity to require a change of venue.

     Defendants' motion is DENIED WITHOUT PREJUDICE.

SO ORDERED

Dated:   July 16, 2009

                                   /s/ Oliver W. Wanger
                                     Oliver W. Wanger
                                United States District Judge